**Yoko Ono LENNON, Sean Ono Lennon, Julian Lennon, and EMI Blackwood Music, Inc, Plaintiffs,**

v.

**PREMISE MEDIA CORP., L.P., C & S Production L.P. d/b/a Rampant Films, Premise Media Distribution, L.P., and Rocky Mountain Pictures, Inc., Defendants.**

No. 08 Civ. 3813(SHS).

United States District Court, S.D. New York.

June 2, 2008.

---

**10.** Defendant Kay has not taken a position on    plaintiffs' request for a stay.

## OPINION & ORDER

SIDNEY H. STEIN, District Judge.

The widow and children of John Lennon bring this action against the producers of a current movie that plays fifteen seconds of the song "Imagine" without permission of the plaintiffs, who own the copyright to the song. The Lennons have moved for a preliminary injunction prohibiting the continued distribution of the movie in its present form and a recall of the existing copies. That motion is denied because plaintiffs have failed to meet the standard required for a court to grant a preliminary injunction. They have not shown a clear likelihood of success on the merits because, on the basis of the current record, defendants are likely to prevail on their affirmative defense of fair use. That doctrine provides that the fair use of a copyrighted work for purposes of criticism and commentary is not an infringement of copyright.

More specifically, plaintiffs seek a preliminary injunction pursuant to Federal Rule of Civil Procedure 65 enjoining defendants Premise Media Corp., L.P., C & S Production L.P. d/b/a Rampant Films, Premise Media Distribution, L.P., and Rocky Mountain Pictures, Inc., from further distributing their movie, "EXPELLED: No Intelligence Allowed" (the "movie"), in its present form and to recall the copies of the movie that are currently being exhibited.

Yoko Ono Lennon, Sean Lennon, and Julian Lennon are, respectively, the widow and sons of the late John Lennon, the composer of "Imagine," and the renewal claimants for the copyright registration to the music and lyrics of "Imagine" (the "song"). EMI Blackwood Music, Inc. is the song's publishing administrator. (Compl. ¶¶ 1–4.) Defendants are the producers and distributors of "Expelled," a recently commercially released movie that concerns the theory of "intelligent design." Plaintiffs allege that defendants' use of an approximately fifteen-second excerpt of "Imagine" in "Expelled" without plaintiffs' permission infringes their copyright in "Imagine."

## I. HISTORY OF THIS ACTION

Plaintiffs filed the complaint in this action in late April 2008, alleging claims of copyright infringement pursuant to 17 U.S.C. § 501 and trademark infringement pursuant to Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a). Plaintiffs subsequently brought the present motion by order to show cause dated April 30, 2008. That same day, after an initial conference and on consent of the parties, the Court entered a temporary restraining order ("TRO") enjoining defendants from distributing any additional copies of "Expelled" for theatrical release, or producing or distributing any DVDs of the movie, pending a hearing on the motion for a preliminary injunction. On May 19, 2008, the Court heard oral argument on the motion for a preliminary injunction. At the conclusion of that hearing, the Court continued the TRO pending its determination of the motion for a preliminary injunction and directed plaintiffs to post security pursuant to Fed.R.Civ.P. 65(c). Now, after considering the arguments and submissions of the parties, as well as having viewed the movie, including the excerpt at issue, the Court makes the following findings of facts and conclusions of law.

## II. FINDINGS OF FACT

"Expelled" is a feature-length (one hour, thirty-nine minute long) nationally released theatrical movie that addresses what it characterizes as a debate between

proponents of intelligent design and the scientific theory of evolution. (Decl. of A. Logan Craft dated May 13, 2008 ("Craft Decl.") ¶ 7.) One of the executive producers of "Expelled" contends that the movie "examines the scientific community's academic suppression of those who ask provocative questions about the origin and development of life." (*Id.* ¶ 7.) According to that same producer, "the film undertakes to inspire viewers to participate in the scientific, political, cultural, and religious debates surrounding this issue, to urge the scientific community to consider views that differ from those held by many members of that community, and to take action to assure that candidates for public office and elected officials take positions and action to accord free speech rights to critics of the adequacy of Darwinian evolution." (*Id.* ¶ 8.) The filmmakers also candidly concede that "Expelled" was "produced and distributed for the purpose of earning a financial return for the investors." (*Id.* ¶ 13.)

The movie is narrated by Ben Stein, a well-known actor and writer (*id.* ¶ 9) and consists principally of Stein's interviews with various proponents of intelligent design and defenders of Darwinian evolution, interspersed with segments of historical stock footage (Decl. of Ronald C. Rodgers dated May 14, 2008 ("Rodgers Decl.") ¶ 11). As another of the producers of "Expelled" explains it, the use of archival footage serves "to create metaphors and analogies to enhance the message [the filmmakers] are trying to convey." (*Id.*) The movie also features several other well known songs. Defendants obtained permission to include every one of those songs in the movie, with the exception of "Imagine." (Transcript of Preliminary Injunction Hearing dated May 19, 2008 ("Hearing Tr.") at 8.) Defendants have not used "Imagine" in promoting the movie. (Craft Decl. ¶ 20.)

John Lennon, the world-famous songwriter and former member of the Beatles, wrote the words and music of "Imagine." Plaintiffs claim, most likely without exaggeration, that Lennon is a "musical icon of the twentieth century" (Aff. of Yoko Ono Lennon dated April 29, 2008 ("Ono Aff.") ¶ 2) and that "Imagine" is one of the most recognizable songs in the world (Compl. ¶ 14). Since John Lennon's death in 1980, Yoko Ono Lennon has worked actively with EMI Blackwood Music, Inc. to control the manner in which Lennon's music is licensed and used. (Ono Aff. ¶ 3.) "Imagine" has been licensed and featured in numerous contexts, including the 1984 film "The Killing Fields," the opening ceremony of the 2006 Winter Olympics, and the New Year's Eve festivities in New York City's Times Square. (*Id.* ¶ 4.) In addition, the Recording Industry Association of America has included the song in its ranking of the most historically significant recordings. (*Id.*)

The fifteen-second excerpt of "Imagine" used in "Expelled" comes approximately one hour and five minutes into the movie and includes ten words from the song. While the fifteen seconds of music play, the lyrics appear on screen in subtitles, as follows:

Nothing to kill or die for/
And no religion too.

(Decl. of John Sullivan dated May 13, 2008 ("Sullivan Decl.") ¶ 15.) Behind the subtitles, four brief sequences of black and white archival footage run. The first sequence features a group of children in a circle; the second is a sequence of a young girl spinning and dancing; the third sequence is of a military parade, which gives way to a close up of Joseph Stalin waving. (*Id.* ¶ 18.) The four sequences constitute 0.27 percent of the total movie's running time. (*Id.* ¶ 17.)

Immediately preceding the excerpt in the movie are short segments in which

several speakers express negative views of religion and the hope that science will eventually diminish religion's role in society. (*Id.*) The last of these interviews, with Dr. P.Z. Myers, proceeds as follows:

> P.Z. Myers: Religion is an, is an idea that gives some people comfort, and we don't want to take it away from them. It's like, it's like knitting. People like to knit. You know, we're not going to take their knitting needles away, we're not going to take away their churches. Uh, but what we have to do is, is get it to a place where religion is treated at the level it should be treated, that is, something fun that people get together and do on the weekend and really doesn't affect their life as much as it has been so far.
>
> Ben Stein: So what would the world look like if Dr. Myers got his wish?
>
> P.Z. Myers: Greater science literacy, which is going to lead to the erosion of religion, and then we'll get this positive feedback mechanism going where, as religion slowly fades away we'll get more and more science to replace it, and that will displace more and more religion, which will allow more and more science in, and we'll eventually get to that point where religion has taken that appropriate place as, as, as side dish rather than the main course.

(Transcript of "Imagine" Clip in "Expelled," Ex. B. to Sullivan Decl.) In a voiceover, Ben Stein then intones, "Dr. Myers would like you to think he's being original but he's merely lifting a page out of John Lennon's songbook." (*Id.*) The excerpt of "Imagine"—virtually "a page out of John Lennon's songbook"—then plays. Following it, the movie cuts to a portion of an interview with David Berlinski that begins with Berlinski saying, "In part, I think Matthew Arnold put his hands on it when he spoke about ... the

withdrawal of faith. There is a connection between a society that has at least a minimal commitment to certain kinds of transcendental values and what human beings permit themselves to do one to the other." (*Id.* ¶ 19.)

"Expelled" was released in theaters in the United States on April 18, 2008. (Craft Decl. ¶ 16.) Defendants timed the release, in part, to coincide with pending so-called "Academic Freedom" bills in several state legislatures, which would permit teachers to offer their students information critical of the theory of evolution. (*Id.* ¶¶ 16, 18.) The movie has also been screened for lawmakers and government officials in Florida, Missouri, and Louisiana, and for members of the United States Congress. (*Id.* ¶ 18.) "Expelled" premiered in 1,052 movie theaters and generated approximately $3 million in revenue in its opening weekend. (*Id.* ¶ 23.) Defendants claim it has since been viewed by more than one million people (*id.*), and generated approximately $7,250,000 in box office ticket sales as of May 11, 2008 (Rodgers Decl. at ¶ 7). The number of theaters screening the movie is declining, however, and defendants have stated that by Friday, May 23, 2008, it would be playing in approximately one hundred theaters. (Hearing Tr. at 14; Rodgers Decl. ¶ 8.)

## III. CONCLUSIONS OF LAW

In most cases, a party seeking a preliminary injunction must demonstrate (1) that it will be irreparably harmed in the absence of an injunction, and (2) either (a) a likelihood of success on the merits or (b) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly in its favor. *Forest City Daly Hous., Inc. v. Town of N. Hempstead,* 175 F.3d 144, 149–150 (2d Cir.1999). A more rigorous standard that requires a "clear" or "substantial" showing of likelihood of success, rather than simply a like-

lihood of success, applies where an injunction will alter, rather than maintain, the status quo. *Id.* (quoting *Tom Doherty Assocs. v. Saban Entm't, Inc.*, 60 F.3d 27, 33–34 (2d Cir.1995)). That is, the "typical" preliminary injunction is prohibitory and seeks only to maintain the status quo. *Tom Doherty*, 60 F.3d at 34. In contrast, a mandatory injunction "is said to alter the status quo by commanding some positive act." *Id.*

█ Plaintiffs acknowledge that the injunction they seek has both mandatory and prohibitory aspects, in that they ask this Court both to order a recall of copies of the movie that have already been distributed (mandatory) and to prohibit further distribution of "Expelled" (prohibitory). (Hearing Tr. at 15–16.) Plaintiffs' motion is thus subject to the more stringent standard applicable to mandatory injunctions of establishing a "clear" or "substantial"

likelihood of success, and plaintiffs do not disagree. *See id.* at 35 (heightened standard must be met if one provision of the challenged injunction is mandatory).

## A. Irreparable Harm

█ It is well-established in this circuit that " 'generally when a copyright plaintiff makes out a prima facie showing of infringement, irreparable harm may be presumed.' " *Merkos L'Inyonei Chinuch, Inc. v. Otsar Sifrei Lubavitch, Inc.*, 312 F.3d 94, 96 (2d Cir.2002) (per curiam) (quoting *ABKCO Music, Inc. v. Stellar Records, Inc.*, 96 F.3d 60, 64 (2d Cir. 1996)); *see also Hasbro Bradley, Inc. v. Sparkle Toys, Inc.*, 780 F.2d 189, 192 (2d Cir.1985). Because, as discussed below, plaintiffs have made out a prima facie case of copyright infringement, there is a presumption that they will be irreparably harmed absent the injunction.[1] *Random*

---

1. Defendants contend that the extensive Second Circuit precedent holding that a presumption of irreparable harm exists in copyright infringement actions where a prima facie showing of infringement has been made was abrogated by the United States Supreme Court decision in *eBay, Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 126 S.Ct. 1837, 164 L.Ed.2d 641 (2006). *eBay* cannot be read in that manner. In *eBay*, the Supreme Court vacated the determination of the Federal Circuit that applied that circuit's " 'general rule that courts will issue permanent injunctions against patent infringement absent exceptional circumstances.' " 547 U.S. at 391, 126 S.Ct. 1837 (quoting *MercExchange, L.L.C. v. eBay, Inc.*, 401 F.3d 1323, 1339 (Fed.Cir.2005)). The Supreme Court held that that rule violated the Patent Act's instruction to courts to decide motions for injunctive relief "in accordance with principles of equity." 35 U.S.C. § 283.

   The presumption of irreparable harm in copyright infringement actions, unlike the rule addressed in *eBay*, does not require courts to impose an injunction following a determination of infringement. *See id.* at 392–93, 126 S.Ct. 1837 ("[A]s in our decision

today, this Court has consistently rejected invitations to replace traditional equitable considerations with a rule that an injunction automatically follows a determination that a copyright has been infringed."). Notwithstanding the presumption of irreparable harm, the decision whether to impose a preliminary injunction in a copyright infringement action remains within the sound discretion of the district courts. *See, e.g., Merkos L'Inyonei Chinuch*, 312 F.3d at 96. Moreover, since *eBay*, the Second Circuit has applied a presumption of irreparable harm in the context of a preliminary injunction sought pursuant to a false advertising claim. *See Time Warner Cable, Inc. v. DIRECTV, Inc.*, 497 F.3d 144, 162 (2d Cir.2007).

   *eBay* is also distinguishable in that it involved a permanent injunction rather than a preliminary injunction. Whereas a court deciding whether to impose a permanent injunction has before it the full record after judgment on the merits, the record on a motion for a preliminary injunction is to some degree incomplete. A presumption temporarily removing the need to prove irreparable harm may serve the ends of equity at this early stage of the litigation even if it would be inappropriate where the record is complete.

*House, Inc. v. Rosetta Books LLC,* 283 F.3d 490, 491 (2d Cir.2002) ("[B]ecause a *prima facie* case of copyright infringement gives rise to a presumption of irreparable harm, the requirement of proof of irreparable harm can in such a case effectively be met by proof of a likelihood of success on the merits."). Defendants have adduced no evidence to rebut that presumption; accordingly, the Court finds that irreparable harm exists absent an injunction.

**B.** *Likelihood of Success on the Merits*

■ On a motion for a preliminary injunction, the burdens of proof "track the burdens at trial." *Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal,* 546 U.S. 418, 429, 126 S.Ct. 1211, 163 L.Ed.2d 1017 (2006). Accordingly, in this action, plaintiffs bear the burden of establishing a prima facie case of copyright infringement. *See, e.g., Castle Rock Entm't, Inc. v. Carol Pub. Group, Inc.,* 150 F.3d 132, 137 (2d Cir.1998). Defendants, in turn, bear the burden of establishing fair use, which is an affirmative defense to a claim of copyright infringement. *Infinity Broadcast Corp. v. Kirkwood,* 150 F.3d 104, 107 (2d Cir.1998).

*1. Plaintiffs' Prima Facie Case of Copyright Infringement.*

■ Section 106 of the Copyright Act of 1976, 17 U.S.C. §§ 101 *et seq.,* "grants copyright owners a bundle of exclusive rights, including the rights to 're-produce the copyrighted work in copies.'" *Castle Rock,* 150 F.3d at 137 (quoting 17 U.S.C. § 106). "In the absence of defenses, these exclusive rights normally give a copyright owner the right to seek royalties from others who wish to use the copyrighted work." *Ringgold v. Black Entm't Tele-*

*vision, Inc.,* 126 F.3d 70, 73 (2d Cir.1997). To establish a claim of copyright infringement, a plaintiff must show (1) ownership of a valid copyright and (2) unauthorized copying or a violation of one of the other exclusive rights afforded copyright owners pursuant to the Copyright Act. *Hasbro Bradley,* 780 F.2d at 192.

Here, the parties agree that "Expelled" copies an approximately fifteen-second excerpt of "Imagine" and defendants did not obtain permission before including the excerpt in the movie. Thus, the second prong of plaintiffs' claim of copyright infringement—unauthorized copying—is satisfied.

■ Whether plaintiffs have satisfied the first requirement by showing ownership of the copyright to "Imagine" is disputed. Plaintiffs assert that because John Lennon, the song's author, die d prior to the copyright's twenty-eight year renewal period, his widow and children were entitled to renew the copyright. *See* 17 U.S.C. § 304(a)(1)(C)(ii). Defendants note, however, that although Yoko Ono Lennon, Sean Lennon, and Julian Lennon renewed the copyright in 1998, the owner of the original copyright was Northern Songs, Limited. (Ex. A, B to Compl.) Northern Songs assigned its copyright to Ono Music in 1984, and Ono Music in turn assigned its copyright to Lenono Music in 1985. (Ex. B to Decl. of Dorothy M. Weber dated May 16, 2008 ("Weber Decl.").) Defendants contend that because the song was originally copyrighted by Northern Songs, Limited, which was a corporate body, Lenono Music, rather than plaintiffs, is the proper party to have renewed the copyright at the end of its initial twenty-eight-year term, unless Northern Songs, Limited originally obtained the copyright from

*See Metro–Goldwyn–Mayer Studios, Inc. v. Grokster, Ltd.,* 518 F.Supp.2d 1197, 1212 (C.D.Cal.2007).

John Lennon by means of assignment or license. *See* 17 U.S.C. § 304(a)(1)(B)(ii). Because the record contains no evidence as to the circumstances under which Northern Songs, Limited obtained the copyright, defendants assert that plaintiffs have failed to meet their burden of showing a clear likelihood of success on their claim of copyright infringement.

■■■■ This Court disagrees. A renewal registration is prima facie evidence of the validity of a copyright. 17 U.S.C. § 304(a)(4)(B). Certainly, the presumption of validity is rebuttable. *See Hamil Am. Inc. v. GFI,* 193 F.3d 92, 98 (2d Cir.1999). The party challenging the validity of the copyright, however, bears the burden of rebutting the presumption. *Id.* Here, defendants raise doubts concerning the validity of the renewal copyright by arguing that plaintiffs have failed to explain gaps in the chain of ownership. Without any evidence of invalidity whatsoever, however, defendants cannot rebut the statutory presumption. Accordingly, plaintiffs have established a prima facie case of copyright infringement.

### 2. *Defendants' Fair Use Defense*

The doctrine of fair use, as codified by the Copyright Act of 1976, is as follows: "[T]he fair use of a copyrighted work ... for purposes such as criticism, comment, news reporting, teaching ..., scholarship, or research, is not an infringement of copyright." 17 U.S.C. § 107. "From the infancy of copyright protection, some opportunity for fair use of copyrighted materials has been thought necessary to fulfill copyright's very purpose, '[t]o promote the Progress of Science and useful Arts....'" *Campbell v. Acuff–Rose Music, Inc.,* 510 U.S. 569, 575, 114 S.Ct. 1164, 127 L.Ed.2d 500 (1994) (quoting U.S. Const. art. I, § 8, cl. 8). The fair use doctrine " 'permits and requires courts to avoid rigid application of the copyright statute when, on occasion, it

would stifle the very creativity which that law is designed to foster.' " *Id.* at 577, 114 S.Ct. 1164 (quoting *Stewart v. Abend,* 495 U.S. 207, 236, 110 S.Ct. 1750, 109 L.Ed.2d 184 (1990) (brackets omitted)).

■■■■ In determining whether the use made of a work in any particular case is a fair use, the factors to be considered include: "(1) the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes; (2) the nature of the copyrighted work; (3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and (4) the effect of the use upon the potential market for or value of the copyrighted work." 17 U.S.C. § 107. The four statutory factors, which are nonexclusive, must be "weighed together, in light of the purposes of copyright." *Campbell,* 510 U.S. at 578, 114 S.Ct. 1164. Moreover, "the determination of fair use is an open-ended and context-sensitive inquiry." *Blanch v. Koons,* 467 F.3d 244, 251 (2d Cir.2006). "The ultimate test of fair use ... is whether the copyright law's goal of promoting the Progress of Science and useful Arts ... would be better served by allowing the use than by preventing it." *Id.* (internal quotation marks omitted).

The Court now turns to each of the four statutory fair use factors.

### a. "The Purpose and Character of the Use"

■■■ The first statutory factor is "[t]he purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes." 17 U.S.C. § 107(1). This factor, "the heart of the fair use inquiry," comprises principally two considerations: whether the use is "commercial" and whether it is "transformative." *Blanch,* 467 F.3d at 251–53 (internal quotation marks omitted).

### i. Commercial Use

Whether the use in question is "of a commercial nature or is for nonprofit educational purposes" is an explicit part of the first fair use factor. *Id.* at 253; *see* 17 U.S.C. § 107(1). The "crux of the profit/nonprofit distinction," however, "is not whether the sole motive for the use is monetary gain but whether the user stands to profit from exploitation of the copyrighted material without paying the customary price." *Bill Graham Archives v. Dorling Kindersley Ltd.*, 448 F.3d 605, 612 (2d Cir.2006). "[C]ourts are more willing to find a secondary use fair when it produces a value that benefits the broader public interest. The greater the private economic rewards reaped by the secondary user (to the exclusion of broader public benefits), the more likely the first factor will favor the copyright holder and the less likely the use will be considered fair." *Blanch*, 467 F.3d at 253. Moreover, "the more transformative the new work, the less will be the significance of other factors, like commercialism, that may weigh against a finding of fair use." *Campbell*, 510 U.S. at 579, 114 S.Ct. 1164.

Defendants in this case concede that "Expelled" is a commercial film from which they seek to profit. (Craft Decl. ¶ 13.) As discussed in what follows, however, the movie's use of "Imagine" is highly transformative, and not merely exploitative, and accordingly, the fact that the use is also commercial receives less weight in the analysis. Moreover, defendants have established for purposes of this motion that the movie contributes to the broader public interest by stimulating debate on an issue of current political concern. (Craft Decl. ¶¶ 16, 18.) Therefore, the commercial purpose of "Expelled" weighs only weakly against a finding of fair use.

### ii. Transformative Use

A work is transformative if it does not "merely supersede[ ] the objects of the original creation" but "instead adds something new, with a further purpose or different character, altering the first with new expression, meaning, or message." *Id.* (internal quotation marks omitted). Although transformative use "is not absolutely necessary for a finding of fair use, the goal of copyright, to promote science and the arts, is generally furthered by the creation of transformative works." *Id.* (citation omitted). Thus, transformative works "lie at the heart of the fair use doctrine's guarantee of breathing space within the confines of copyright." *Id.* There is a strong presumption that this factor favors a finding of fair use where the allegedly infringing work can be characterized as involving one of the purposes enumerated in 17 U.S.C. § 107: "criticism, comment, news reporting, teaching …, scholarship, or research." *See NXIVM Corp. v. Ross Inst.*, 364 F.3d 471, 477 (2d Cir.2004).

Defendants' use is transformative because the movie incorporates an excerpt of "Imagine" for purposes of criticism and commentary. The filmmakers selected two lines of the song that they believe envision a world without religion: "Nothing to kill or die for/ And no religion too." ("Imagine" lyrics, Ex. D to Weber Decl.) As one of the producers of "Expelled" explains, the filmmakers paired these lyrics and the accompanying music to a sequence of images that "provide a layered criticism and commentary of the song." [2]

---

**2.** Although defendants' reasons for using "Imagine" in the movie and their ability to articulate those reasons ease the analysis, neither "is *sine qua non* for a finding of fair use." *Blanch*, 467 F.3d at 255 n. 5. Indeed, much of defendants' asserted purpose for excerpting the song is apparent from a viewing of the movie.

(Sullivan Decl. ¶ 18.) The Cold War-era images of marching soldiers, followed by the image of Stalin, express the filmmakers' view that the song's secular utopian vision "cannot be maintained without realization in a politicized form" and that the form it will ultimately take is dictatorship. (*Id.*) The movie thus uses the excerpt of "Imagine" to criticize what the filmmakers see as the naïveté of John Lennon's views. (Sullivan Decl. ¶ 14.)

The excerpt's location within the movie supports defendants' assertions. It appears immediately after several scenes of speakers criticizing the role of religion in public life. In his voiceover, Ben Stein then connects these sentiments to the song by stating that they are merely "a page out of John Lennon's songbook." (Transcript of "Imagine" Clip in "Expelled," Ex. B. to Sullivan Decl.) In defendants' view, "Imagine" "is a secular anthem caught in a loop of history recycling the same arguments from years past through to the present. We remind our audience that the ideas they just heard expressed from modern interviews and clips that religion is bad are not new and have been tried before with disastrous results." (Sullivan Decl. ¶ 21.) The filmmakers "purposefully positioned the clip . . . between interviews of those who suggest that the world would be better off without religion and an interview suggesting that religion's commitment to transcendental values place limits on human behavior. . . . mak[ing] the point that societies that permit Darwinism to trump all other authorities, including religion, pose a greater threat to human values than religious belief." (*Id.* ¶ 20.)

Defendants' use of "Imagine" is similar to the use at issue in a recent decision of the United States Court of Appeals for the Second Circuit in which fair use was found, *Blanch v. Koons.* There, the visual artist Jeff Koons copied photographer Andrea Blanch's photograph from a fashion maga-

zine without permission and incorporated a portion of it into one of his paintings. 467 F.3d at 247. Blanch's photograph featured the legs and feet of a woman wearing expensive sandals, resting in a man's lap in what appeared to be an airplane cabin. *Id.* at 248. Koons included the legs and feet in his painting, inverting their orientation, adding a heel to one of the sandals, and placing them, along with images of several other pairs of legs and feet, against a background including a grassy field and Niagara Falls. *Id.* at 247. The legs appeared to dangle over images of confections. *Id.*

The Second Circuit panel found Koons's use of Blanch's photograph transformative. *Id.* at 253. The court noted that Koons used the image for "sharply different" purposes than Blanch, in that he used it "as fodder for his commentary on the social and aesthetic consequences of mass media." *Id.* at 252. As Koons had explained, by juxtaposing women's legs against a backdrop of food and landscape, "he intended to comment on the ways in which some of our most basic appetites—for food, play, and sex—are mediated by popular images." *Id.* at 247 (internal quotation marks omitted). Moreover, Koons altered the colors, background, medium, size, and details of the image in incorporating it into his painting. *Id.; see also Bill Graham Archives*, 448 F.3d at 611 (finding the defendants' inclusion of the plaintiff's images in a book to be transformative where the defendants significantly reduced the images' size and "combin[ed] them with a prominent timeline, textual material, and original graphical artwork, to create a collage of text and images on each page").

As in *Blanch*, defendants here use a portion of "Imagine" as "fodder" for social commentary, altering it to further their distinct purpose. Just as Koons placed a

portion of Blanch's photograph against a new background, defendants here play the excerpt of the song over carefully selected archival footage that implicitly comments on the song's lyrics. They also pair the excerpt of the song with the views of contemporary defenders of the theory of evolution and juxtapose it with an interview regarding the importance of transcendental values in public life.

Plaintiffs contend that defendants' use of "Imagine" is not transformative because defendants did not alter the song, but simply "cut and paste[d]" it into "Expelled." As the foregoing discussion illustrates, however, this argument draws the transformative use inquiry too narrowly. To be transformative, it is not necessary that defendants alter the music or lyrics of the song. Indeed, defendants assert that the recognizability of "Imagine" is important to their use of it. (Sullivan Decl. ¶ 16.) Defendants' use is nonetheless transformative because they put the song to a different purpose, selected an excerpt containing the ideas they wished to critique, paired the music and lyrics with images that contrast with the song's utopian expression, and placed the excerpt in the context of a debate regarding the role of religion in public life.

Plaintiffs also contend that defendants' use of "Imagine" is not transformative because it was unnecessary to use it in order to further the purposes defendants have articulated. Determining whether a use is transformative, however, does *not* require courts to decide whether it was strictly necessary that it be used. In *Blanch,* although certainly Koons did not need to use Blanch's copyrighted photo, as opposed to some other image of a woman's feet, in his painting, the Second Circuit did not suggest that this lack of necessity weighed against a finding of fair use. Similarly, in *Bill Graham Archives,* the Second Circuit found a transformative use

in the defendants' unauthorized inclusion of several of the plaintiff's images—principally concert photos—in a coffee-table book about the musical group the Grateful Dead. 448 F.3d at 607, 608–12. Although the defendants manifestly could have proceeded without the plaintiff's images, which constituted only a small part of the book, this posed no obstacle to a finding of fair use.

Moreover, defendants contend that it was important that they use "Imagine," rather than some other song expressing similar views, because it is the "paradigm example" that "has the most cultural force to it because it represents the most popular and persuasive embodiment of th[e] viewpoint that the world is better off without religion." (Hearing Tr. at 23.) Defendants also assert that their purpose in using the excerpt of the song was in part to critique the emotional impact the song has on listeners. (*Id.* at 23–24.)

Finally, although a minor factor, it weighs in favor of a finding of transformative use that the excerpt of "Imagine" in "Expelled" constitutes only 0.27 percent of the movie's total running time. *See id.* at 611 (noting that the plaintiff's images constituted less than 0.20 percent of the defendants' book and stating, "we are aware of no case where such an insignificant taking was found to be an unfair use of original materials"). (Sullivan Decl. ¶ 17.)

In sum, defendants' use of "Imagine" is transformative because it does not "merely supersede[ ] the objects of the original creation" but rather "adds something new, with a further purpose or different character, altering the first with new expression, meaning, or message." *Campbell,* 510 U.S. at 579, 114 S.Ct. 1164. This consideration thus weighs strongly in favor of fair use.

### iii. The Propriety of Defendants' Actions

■ Plaintiffs note that defendants obtained permission for all the other music used in the movie and contend that defendants' failure similarly to seek permission to use "Imagine" evinces bad faith. The Second Circuit, however, has rejected this proposition. *See Blanch*, 467 F.3d at 256 ("We are aware of no controlling authority to the effect that the failure to seek permission for copying, in itself, constitutes bad faith."). Indeed, the Second Circuit, in *Blanch*, approvingly quoted the dictum in *Campbell* that " '[i]f the use is otherwise fair, then no permission need be sought or granted.' " *Id.* (quoting *Campbell*, 510 U.S. at 585 n. 18, 114 S.Ct. 1164). The fact that defendants here obtained permission to use the other music in the movie does not alter this conclusion.

### b. "The Nature of the Copyrighted Work"

■ The second fair use factor considers "the nature of the copyrighted work." 17 U.S.C. § 107(2). This factor " 'calls for recognition that some works are closer to the core of intended copyright protection than others, with the consequence that fair use is more difficult to establish when the former works are copied.' " *Blanch*, 467 F.3d at 256 (quoting *Campbell*, 510 U.S. at 586, 114 S.Ct. 1164). Two distinctions are relevant to this analysis: (1) "whether the work is expressive or creative, such as a work of fiction, or more factual, with a greater leeway being allowed to a claim of fair use where the work is factual or informational," and (2) "whether the work is published or unpublished, with the scope of fair use involving unpublished works being considerably narrower." *Id.* (quoting 2 Howard B. Abrams, *The Law of Copyright* § 15:52 (2006)).

Defendants here concede, as they must, that "Imagine" is a creative work and, as such, is at the "core" of copyright protection. They note, however, that the work is widely published, which weighs a bit in favor of fair use. Moreover, this second statutory factor "may be of limited usefulness where the creative work of art is being used for a transformative purpose." *Bill Graham Archives*, 448 F.3d at 612. Indeed, where, as here, the secondary work comments on the "social and aesthetic meaning" of the original, rather than "exploit[ing] its creative virtues," the second fair use factor has "limited weight." *Blanch*, 467 F.3d at 257. It thus weighs against a finding of fair use, but not strongly.

### c. "The Amount and Substantiality of the Portion Used in Relation to the Copyrighted Work as a Whole"

■ The third statutory fair use factor is "the amount and substantiality of the portion used in relation to the copyrighted work as a whole." 17 U.S.C. § 107(3). The inquiry under this factor focuses on the copyrighted work, not the allegedly infringing one, *Bill Graham Archives*, 448 F.3d at 613, and considers whether "the quantity and value of the materials used are reasonable in relation to the purpose of the copying," *Blanch*, 467 F.3d at 244 (internal quotation marks omitted). This factor has both "a quantitative and a qualitative component," in that "[t]he factor favors copyright holders where the portion used by the alleged infringer is a significant percentage of the copyrighted work, or where the portion used is essentially the heart of the copyrighted work." *NXIVM*, 364 F.3d at 480.

■ The quantitative component of this inquiry clearly favors defendants. Defendants use only a fifteen-second excerpt of "Imagine," a song that runs three minutes in total. (Decl. of Dr. Lawrence Ferrara dated May 14, 2008 ("Ferrara Decl.") ¶ 5.) Moreover, they selected a portion of the song ("Nothing to kill or die for/

And no religion too") that expresses the idea they specifically wished to critique—that an ideal society would be entirely secular—without copying other portions of the song that do not express that idea. (Sullivan Decl. ¶ 17.) Thus, quantitatively, defendants' use was reasonable in light of their purpose in copying.

■■■■■ Assessing the qualitative aspect of the inquiry is appropriately somewhat more complicated. Plaintiffs' expert musicologist, Dr. Lawrence Ferrara, analyzed the music and concluded that "the portion of 'Imagine' that appears in 'Expelled' represents a substantial and memorable part of the overall 'Imagine' musical composition." (Ferrara Decl. ¶ 2.) In other words, Dr. Ferrara's opinion is that the fifteen-second excerpt at issue contains the "heart" of "Imagine." Specifically, he found that the excerpt of "Imagine" in "Expelled" includes musical phrases that appear in nearly 50 percent of the song. (*Id.*) The fifteen-second excerpt consists of two iterations of (1) a two-bar vocal phrase, (2) two phrases of lyrics, (3) a two-bar piano phrase, and (4) a two-bar variant piano phrase. (*Id.* ¶ 6.) Although the lyrics in the excerpt appear only once in the song, the two-bar vocal phrase in the excerpt is repeated twelve times in the song, the two-bar piano phrase occurs nine times in the verses and twice in the introduction, and the two-bar variant piano phrase occurs three times in the song. (*Id.* ¶¶ 8–10.) Thus, Dr. Ferrara concludes, although only a fifteen-second portion of the sound recording of "Imagine" appears in "Expelled," the musical phrases heard in those fifteen seconds are repeated during a full 87 seconds of the song, or 48.8 percent of its total duration. (*Id.* ¶ 12.) He also concludes that the portion of the song defendants use is immediately recognizable as being from "Imagine." (*Id.* ¶ 17.)

Assuming Dr. Ferrara's analysis is correct, and that, as a result, defendants' excerpt constitutes the heart of plaintiffs' copyrighted work, it is not dispositive of the issue for two reasons. First, as Dr. Ferrara makes patent, "Imagine" is musically repetitive, and it is not clear that defendants could have used any portion of the song without ending up with an excerpt that referenced a significant part of the overall composition. For this reason alone, the Court could not conclude that defendants' use was unreasonable in light of their purpose.

Second, the Supreme Court explained in *Campbell* that "[c]opying does not become excessive in relation to parodic purpose merely because the portion taken was the original's heart." 510 U.S. at 588, 114 S.Ct. 1164. In *Campbell*, the Court considered whether the rap group 2 Live Crew's use of a portion of Roy Orbison's song "Oh, Pretty Woman" constituted fair use. *Id.* at 571–72, 114 S.Ct. 1164. In considering the third fair use factor, the Court assumed for purposes of analysis that the defendants' quotation of the original's opening musical phrase and first line of lyrics went to the heart of the original song. *Id.* at 588, 114 S.Ct. 1164. The Court concluded, however, that "[i]f 2 Live Crew had copied a significantly less memorable part of the original, it is difficult to see how its parodic character would have come through." *Id.* at 588–89, 114 S.Ct. 1164. Although the Supreme Court's analysis was specifically directed at parody, this Court is aware of no reason not to apply it equally to copying for purposes of criticism and commentary. Using an easily recognizable portion of "Imagine" was relevant to defendants' commentary because they wished to demonstrate that the negative views of religion expressed by their interview subjects were not new. (Sullivan Decl. ¶¶ 17, 21.)

Accordingly, both quantitatively and qualitatively, the portion of "Imagine" that defendants copy is reasonable in light of their purpose for doing so. This third factor therefore weighs in favor of fair use.

### d. "The Effect of the Use Upon the Potential Market for or Value of the Copyrighted Work"

■ The fourth factor is "the effect of the use upon the potential market for or value of the copyrighted work." 17 U.S.C. § 107(4). "In considering the fourth factor, [the] concern is not whether the secondary use suppresses or even destroys the market for the original work or its potential derivatives, but whether the secondary use usurps the market of the original work. The market for potential derivative uses includes only those that creators of original works would in general develop or license others to develop." *Blanch,* 467 F.3d at 258. In this analysis, "[t]he court looks to not only the market harm caused by the particular infringement, but also to whether, if the challenged use becomes widespread, it will adversely affect the potential market for the copyrighted work." *Bill Graham Archives,* 448 F.3d at 614.

■ Plaintiffs understandably contend that if unauthorized use of "Imagine" were to become widespread, it would harm the marketplace for licensing the song. In *Bill Graham Archives,* however, on a full record developed on a motion for summary judgment, the Second Circuit rejected a similar argument regarding lost licensing revenue. 448 F.3d at 614–15. That court explained that although the plaintiff had established a market for licensing its concert posters, the defendants' use of the posters in their biographical book "f[ell] within a transformative market," and therefore the plaintiff "d[id] not suffer market harm due to the loss of licensing fees." *Id.* at 615. Here, similarly, defendants copied plaintiffs' work for a transformative purpose, and plaintiffs have prof-

fered no evidence to date that permitting defendants to use a fifteen-second portion of the song for a transformative purpose will usurp the market for licensing the song for traditional uses. Accordingly, this factor does not weigh strongly, if at all, against fair use.

### e. Conclusion Regarding Fair Use

■ The balance of factors clearly favors a finding of fair use. Defendants' use of "Imagine" is transformative because their purpose is to criticize the song's message. Moreover, the amount and substantiality of the portion used is reasonable in light of defendants' purpose. Although "Imagine," as a creative work, is at the core of copyright protection, and defendants' use of the song is at least partially commercial in nature, the weight of these factors against a finding of fair use is limited given that defendants' use is transformative. Finally, plaintiffs have not shown that defendants' use will usurp the market for licensing the song for nontransformative purposes. In sum, allowing defendants' use would better serve "the copyright law's goal of promoting the Progress of Science and useful Arts ... than [would] preventing it." *Blanch,* 467 F.3d at 251 (internal quotation marks omitted). Defendants have established that they are likely to prevail on their fair use defense, and accordingly plaintiffs have not shown that they are clearly likely to succeed on the merits of their copyright infringement claim.

### C. *Balance of Hardships*

■ Although plaintiffs have failed to establish a clear likelihood of success on the merits, they are still entitled to a preliminary injunction if they can show "sufficiently serious questions going to the merits of the case to make them a fair ground for litigation, and a balance of

hardships tipping decidedly in [their] favor." *Tom Doherty*, 60 F.3d at 33. On this record, plaintiffs have not shown that the balance of hardships decidedly favors them.

Defendants claim that an injunction barring them from further distributing "Expelled" with the excerpt of "Imagine" and requiring the recall of extant prints would require them to reedit the movie to insert substitute footage making the same point. (Supplemental Decl. of John Sullivan dated May 19, 2008 ("Sullivan Supplemental Decl.") ¶ 5.) They estimate that selecting appropriate alternative footage and integrating it into the movie would require weeks of work. (*Id.* ¶¶ 6–10.) Indeed, defendants estimate that "the cost of recutting the film would be several hundred thousand dollars." (Craft Decl. ¶ 35.) In addition, they anticipate that transferring the new footage to 35 millimeter film for theatrical screening, including the movie's upcoming Canadian theatrical release, would cost tens of thousands of dollars. (*Id.* ¶ 37.) Defendants also claim that an injunction at this time would jeopardize the imminent Canadian theatrical release (it is currently scheduled for "early June") and delay the contract for the movie's release on DVD. (*Id.* ¶¶ 33, 37.)

Plaintiffs challenge a number of these assertions. In particular, they contend that the costs of reediting the movie and reprinting the affected portions onto 35 millimeter film stock would be substantially lower than defendants claim. (Decl. of Walter "Chip" Cronkite III dated May 16, 2008 ("Cronkite Decl.") at ¶¶ 17–18.)

This Court need not decide whether the hardship to defendants would be as extensive as they claim, because the balance of hardships would not in any event tip decidedly in plaintiffs' favor. An injunction would require defendants to bear some degree of financial hardship: even plaintiffs' expert concedes that reprinting the movie would cost defendants at least $56,000. (*Id.* ¶ 18.) Defendants face additional costs associated with any delay in the Canadian theatrical and DVD releases occasioned by any required editing.

Plaintiffs, on the other hand, assert that the hardship they would face if an injunction does not issue is that the lack of an injunction would engender the perception that it is not necessary to seek permission to copy, with attendant loss of licensing fees. (Decl. of Nancy Weshkoff, Ex. C to Weber Decl., ¶¶ 21–22.) Although these claims are plausible, they are intangible at best, and are answered by the fact that fair use is a defense to copyright infringement. Without some showing that plaintiffs will face substantial lost licensing revenue absent an injunction, this Court cannot conclude that the balance of hardships tips decidedly in plaintiffs' favor.

## IV. CONCLUSION

Because defendants are likely to prevail on their fair use defense, plaintiffs have failed to show, on the basis of the record developed to date, a clear likelihood of success or even a simple likelihood of success on the merits of their copyright infringement claim. Plaintiffs have also not shown that the balance of hardships tips decidedly in their favor. Accordingly, plaintiffs' motion for a preliminary injunction is denied.

SO ORDERED.